[Crim. No. 1816.   Third Dist.   Apr. 24, 1945.]

THE PEOPLE, Respondent, v. ROBERT NOBLE et al.,
Appellants.

Robert Noble, Ellis O. Jones and F. K. Ferenz, in pro. per.,
and E. W. Miller for Appellants.

A. L. Wirin and Wayne M. Collins as Amici Curiae on be-
half of Appellants.

Robert W. Kenny, Attorney General, and Sherrill Halbert,
Deputy Attorney General, for Respondent.

854

THE COURT.—In 1941 the Legislature of California adopted an act known as the Subversive Organization Registration Act (Stats. 1941, ch. 183; Deering's Gen. Laws, Act 8426) requiring the registration with the Secretary of State of "every corporation, association, society, camp, group, bund, political party, assembly, and . . . every other body or organization composed of two or more persons or members, which:

"(a) Directly or indirectly advocates, advises, teaches, or practices, the duty, necessity or propriety of controlling, conducting, seizing, or overthrowing the Government of the United States, or of this State or of any political subdivision thereof by force or violence; or

"(b) Is subject to foreign control" in that "(1) it solicits or accepts financial contributions, loans or support of any kind, directly or indirectly, from, or is affiliated directly or indirectly with, a foreign government or a political subdivision thereof, or an agent, agency, or instrumentality of a foreign government or political subdivision thereof, or a political party in a foreign country, or an international political organization, or (2) its policies, or any of them, are determined by or at the suggestion of, or in collaboration with, a foreign government or political subdivision thereof, or an agent, agency, or instrumentality of a foreign government or a political subdivision thereof, or a political party in a foreign country, or an international political organization."

The act required every existing organization of the type hereinabove referred to to file with the Secretary of State, within thirty days after the effective date of the act, and every new organization of such type, within ten days after its organization, a detailed statement giving the address of all its branches, the names, addresses and nationalities of its officers, the qualifications required for membership, the assets owned by it, contributions received by it, and similar information not necessary to detail here. It imposed heavy fines on any organization which violated its provisions and also provided that:

"Any officer of a corporation, association, or organization to which this act applies and every member of the board of directors, board of trustees, executive committee, or other similar governing body, who violates any provision of this act or permits or acquiesces in the violation of any provision of this act by such corporation, association, or organization shall be guilty of a felony and punishable by a fine of not

less than five hundred dollars ($500) and not more than five thousand dollars ($5,000) or by imprisonment in the State prison for not less than six months and not more than five years, or by both such fine and imprisonment.''

The act further provided that any member of such an organization who remained a member thereof with knowledge that the organization had violated any of the provisions of the act was guilty of a misdemeanor. Labor unions, religious, fraternal and patriotic organizations, societies or associations whose objectives and aims do not contemplate the overthrow of the Government of the United States or of the state or of any political subdivision thereof by force and violence are specifically exempted from the act.

The appellants, Robert Noble, Ellis O. Jones, F. K. Ferenz, Leone Menier, James M. McBride, Joan McBride, Daniel Van Meter, Baron Van Meter and Genevieve Kerrigan, were charged by an amended indictment presented by the Grand Jury of Sacramento County with violating said Subversive Organization Registration Act.

The trial by jury was commenced on August 3, 1942, and on October 22, 1942, all of the appellants were found guilty as charged in the amended indictment. A motion for a new trial was made by each and all of said appellants, which motions were denied by the trial court. A motion in arrest of judgment on behalf of the appellants Leone Menier and Genevieve Kerrigan was denied by the court. Applications for probation on behalf of appellants Daniel Van Meter, Baron Van Meter, Leone Menier and Genevieve Kerrigan, were submitted to the court and said applications for probation were denied, whereupon judgments were pronounced, sentencing the appellants Menier, Kerrigan and Joan McBride to be imprisoned in the California prison for women for the term prescribed by law, and sentencing the appellants Noble, Jones, Ferenz, Baron Van Meter, Daniel Van Meter and James McBride to the state prison for the period prescribed by law. The court further ordered that the term of imprisonment as to the appellants Robert Noble and Ellis O. Jones commence at the termination of the term of imprisonment imposed by the judgment of the United States District Court for the Southern District of California, wherein the said appellants Robert Noble and Ellis O. Jones were sentenced for conspiracy to violate the Sedition Act.

All appellants have filed notices of appeal from the judgments and from the orders denying a new trial, and the appellants Leone Menier and Genevieve Kerrigan, in addition thereto, have filed notices of appeal from the order denying their motion in arrest of judgment. ▉ There is no appeal from the order denying the motion in arrest of judgment, as such order may be reviewed only upon appeal from the judgment. (*People* v. *Dallas*, 42 Cal.App.2d 596 [109 P.2d 409].)

An opening brief was filed on behalf of appellant F. K. Ferenz but no opening brief was filed on behalf of any other appellant. However, the reply brief filed by counsel for appellant Ferenz was also on behalf of all appellants. Appellants Ferenz, Noble and Jones have each filed with this court short typewritten statements setting forth a number of contentions and containing numerous statements outside of the record, but in view of the fact that the relevant contentions contained in said separate statements are fully and more clearly covered in the brief filed by counsel on behalf of appellants, it will not be necessary to refer specifically to said separate statements filed by said appellants.

The briefs filed by and on behalf of the appellants set forth the following grounds for a reversal of the judgments:

"I.   That the California Subversive Organization Registration Act is unconstitutional under both federal and state Constitutions in that the act relates to matters covered by federal legislation; it violates the due process clauses of both state and federal Constitutions.

"II.   That no governing body of the alleged organization, Friends of Progress, was proved by clear and convincing evidence and that, therefore, the prosecution's case against the defendants failed.

"III.   That the evidence is insufficient to sustain the verdict on the question of the overthrow of the government by force and violence and affiliation of the Friends of Progress with a foreign agent.

"IV.   That the verdict against all of the defendants was the result of the prosecution's appeal to passion and prejudice throughout the trial and in the closing address to the jury.

"V.   That the court erred in denying the motion to advise the jury to acquit each and all of the defendants.

"VI.   That the court erred in denying the motion of all defendants for a new trial.

"VII. That the court erred in denying the motion of arrest of judgment.

"VIII. That the judgment of conviction is erroneous and contrary to both the evidence and the law.

"IX. That the court erred in denying the motion of all defendants for a mistrial because of the alleged misconduct of the prosecution in making alleged misstatements of the evidence to the jury in the closing argument.

"X. That the judgment should be reversed for errors at this trial."

A brief was filed by the American Civil Liberties Union as amicus curiae, which brief seeks a reversal of the judgments upon the grounds that the California Subversive Organization Registration Act is unconstitutional under both the federal and state Constitutions in that the act relates to matters covered by federal legislation; that it violates the due process clauses of both state and federal Constitutions and that it is vague, indefinite and uncertain and imposes criminal guilt without setting up any reasonably ascertainable standard of guilt.

Before proceeding to discuss the contentions of appellants it is necessary that we summarize the factual situation as shown by the record. Although the record is voluminous, consisting of more than 6,000 pages of testimony and a large number of exhibits, there is surprisingly little conflict between the parties as to the basic facts upon which respondent relies in support of the sufficiency of the evidence. The principal disagreement between the parties is as to the inferences and deductions that may properly be drawn from such facts.

The amended indictment charged that appellants, *as members of the governing body* (italics ours) of an association, society, group, bund, assembly and political party known as the "Friends of Progress," which directly and indirectly advocated, advised, taught and practiced the duty, necessity, and propriety of controlling, conducting, seizing and overthrowing the Government of the United States of America, and of the State of California, by force and violence, and which said association, society, group, bund, assembly and political party was then and there subject to foreign control, in that said association, society, group, bund, assembly and political party solicited and accepted, both directly and in-

858

directly, financial contributions, loans and support from, and was affiliated, both directly and indirectly, with a foreign government and political subdivision thereof, and an agent, agency, or instrumentality of a foreign government and a political subdivision thereof, and a political party in a foreign country and an international political organization; and in that the policies of said association, society, group, bund, assembly and political party, or some of them, were then and there determined by, at the suggestion of and in collaboration with, a foreign government, and a political subdivision thereof, and an agent, agency and instrumentality of a foreign government and political subdivision thereof, and a political party in a foreign country and an international political organization, did wilfully and unlawfully and feloniously fail to file the information and documents, or any part thereof, as required by subdivisions (a), (b), (c) and (d), of section 2, of the said Subversive Organization Registration Act.

In setting forth the evidence which respondent contends is sufficient to sustain the verdict of the jury we shall follow the order in which same was introduced at the trial.

It appears that Adolf Hitler came into power in Germany in 1933 and that he immediately began preparations for a war to conquer not only Central Europe but also to make Germany the dominant military power in the world. Shortly thereafter Germany withdrew from the League of Nations and, according to the record, Dr. Herman Rauschning, former president of the Free City of Danzig during 1933 and 1934 and former member of the German National Socialist Party (usually referred to as the Nazi party) between 1931 and 1934, went from Geneva to Berlin to confer with Hitler concerning Germany's action in withdrawing from the League of Nations, particularly as to the effect it would have on the status of Danzig which was dependent on the one hand on the policy of Germany and on the other hand on the policy of Poland. He advised Hitler that the diplomats in Geneva feared that Germany's action would bring on war and he expressed to Hitler his fear that the beginning of war would draw Great Britain and France into it, and eventually the United States. Hitler replied that there was no reason for any fear; that neither Great Britain nor America would be able to go into a new war with Germany; that to overthrow Poland and perhaps Czechoslovakia would be an easy task. Dr. Rauschning

again stated his fear that Great Britain and France would go to war against Germany if Germany should violate the Treaty of Versailles, and that if Great Britain took part in a European war it would not be long until the United States would enter the war on the side of Great Britain. At this point Hitler laughed and said that the United States would never enter a European war against Germany because it had its hands full with its own internal affairs. He further told Dr. Rauschning that if the United States evidenced any intent to get into a new war with Germany and participate in the politics of Europe he had a command over many centers to accelerate the outbreak of a revolution in the United States and destroy it. He then proceeded to detail the methods that he would use to break down the morale and disintegrate the unity of the American people, saying that he would play one race against the other, one social group against the other. He stated further that Germany had many friends in every country and that it would be very easy to obtain adherents to his cause, and that to carry out his purpose in keeping the United States from entering upon a European war he would rely chiefly upon former Germans—American citizens of German origin who would take over the leadership of such movements in the United States.

The record also shows methods used by the Nazi party to gain complete domination in Germany and the oppressive methods used to restrict the Jews and other groups. These methods and measures are so well known to well informed persons that it is unnecessary to detail them here.

In the United States, sometime in 1933, there came into existence an organization known as the Friends of New Germany, devoted to the advancement of the interests of Germany. In 1936, by an edict issued in Germany, the name of the organization was changed to the German-American Bund. There was no change in the officers of the organization. The national headquarters of the German-American Bund were in New York and the local headquarters in Los Angeles at 634 West Fifteenth Street, at a place known as the "Deutsches Haus." The German-American Bund membership cards were similar to the Friends of New Germany membership cards and were sent from the national headquarters to the local Bund leaders who would then distribute them to the

members. The members of the German-American Bund retained the same numbers on their new membership cards as they had on the membership cards of the Friends of New Germany. The "Weckruf" was the official newspaper of the Friends of New Germany and the German-American Bund. In the transition from the Friends of New Germany to the German-American Bund there appeared to be no change in policy or program.

The German-American Bund was an organization of the people in the United States who were sympathetic to Hitler, the control of which came from Germany. Its aims in general were to promote the interest of the Third Reich in America and to bring about a closer appreciation of German culture by the people of America, particularly in connection with the new culture of the New Germany developed by the Third Reich and that particular culture which Adolf Hitler expounded, to foster and develop the sympathies of the people of this country for Hitler and his regime.

It appears from the record that one Hermann Schwinn was the leader of the Western Division of the Friends of New Germany and the German-American Bund and was known as the Fuehrer. According to the testimony of the witness Ness who joined the German-American Bund in June, 1936, and was inducted at a closed meeting of the organization, applicants for membership were told by Schwinn that they were gathered there on that occasion for a more serious and far-reaching purpose than they realized; that they should pledge themselves to give all of their aid to the Third Reich; that they would only be called upon at that time to give moral and financial aid, but there would come a time in the future when they would be called upon to give even more freely to the cause of the New Germany, that is, to give their life's blood in the cause of the Third Reich. Schwinn then extended his right hand in the Nazi salute and said, "Heil Hitler," to which the applicants responded in the same manner. Schwinn then shook their hands and welcomed them as members of the Bund.

It appears further from the record that propaganda literature and material was being received regularly from the Nazi party in Germany by way of German boats arriving at the port of San Pedro, and that Schwinn would board these German vessels and meet and confer with the captains thereof

and make an exchange of envelopes and packages. He would return with these to the Deutsches Haus and open the packages, and the witness observed that it was propaganda material, printed in Germany, bearing the official stamp of the Nazi party described as an eagle over an encircled swastika. The material printed in German was translated and that which was printed in English was typed and the original material was destroyed. The material was then published in the Bund's official newspaper and also used for propaganda purposes at the Deutsches Haus. Subsequently, a change was made in this procedure so that instead of contacting the captains of the boats to obtain the propaganda material, Schwinn dealt directly with a representative of the Nazi party in Germany who had been assigned to each of the boats. Schwinn was in direct connection and communication with the Nazi officials in Germany, and at one time he told the members of the Bund that the Nazi party in Germany was dissatisfied with the rate of growth of the German-American Bund in the United States and wanted it to grow faster. Schwinn further stated that the Nazi officials were anxious to impose the German culture as much as they possibly could on the American scene; that they wanted to spread information of the good Adolf Hitler had done for Germany and how the people of the United States could also benefit by following the same line of political reasoning.

At some of the meetings of a select group conducted by Schwinn in 1936 and attended by the witness Ness, discussions were had of the possibility of armed conflict between Germany and the United States, and the activities that the members might engage in that would be beneficial to Germany if Germany were at war with the United States. Various methods of sabotaging any war effort by the destruction of municipal water works, industrial water systems and other things were discussed.

It appears from the record that appellant F. K. Ferenz joined the Friends of New Germany in September, 1933, and that he became a member of the German-American Bund automatically when said Bund succeeded the Friends of New Germany. Although he denied becoming a member of the German-American Bund, the record amply supports the conclusion that he paid dues into the organization and was a mem-

ber. Ferenz, who was a German-born American citizen, was very active in seeking to build up, in Los Angeles and vicinity, a favorable opinion of Adolf Hitler and the Nazi policies. To use his own phrase, he was interested in seeing that the "truth about Hitler" was presented to the people of Los Angeles. He published a book entitled "Hitler," and spoke upon the subject of Hitler before various service clubs, schools and churches. He wrote many letters for the correspondence columns of newspapers upon conditions in the Third Reich and the "truth" about Hitler in reply to letters which he felt were not truthful. The subject of one of his addresses was "Why I am in favor of Hitler."

There were introduced in evidence letters received by Ferenz from his sister-in-law in Vienna, which letters indicated that the sister-in-law was a member of the Nazi underground movement in Vienna, and indicated that Ferenz was keeping very closely in touch with the progress and activities of the Nazi movement in Germany. Letters were also introduced in evidence which indicated quite clearly that Ferenz had communicated with Nazi officials in Germany seeking propaganda material for use in promoting the German cause in the United States. It also appears from the record that Ferenz conducted a book store in Los Angeles and also operated a motion picture theatre. Inside of his book store a plaque of Adolf Hitler hung on the wall, in a black velvet shrine background. As people entered the store they saluted the plaque by raising their right arms toward the plaque. There were German books relating to the National Socialist Labor Party known as the Nazi party, and abbreviated as "N.S.D.A.P." Among the books were "Life of Horst Wessel"; a book the cover of which bore a swastika and the letters "S.A." containing Storm Trooper's poems, all of which the witness, Dr. Malbone Graham, Professor of Political Science at the University of California at Los Angeles, had seen in the Nazi party book stores in Germany. There was also a book of documents regarding the first four-year plan of Adolf Hitler, with a foreword by Reich Minister Dr. Joseph Goebbels, an official publication of the Nazi party. Dr. Graham testified that when he was in Germany he endeavored to purchase from an official Nazi party book store the book with the swastika entitled "S.A." hereinbefore referred to, but was not permitted to do so, a sign in the store reading, "Only permitted for members of the

party.'' There were also on sale in the book store of Ferenz various publications which must be considered as violently anti-Jewish, and publications criticising the British government; and Ferenz admitted selling copies of Hitler's book, ''Mein Kampf.''

In his motion picture theatre Ferenz exhibited German films, which films were produced under the control of Dr. Goebbels, the Propaganda Minister of the Third Reich. In fact, the evidence shows that after the establishment of the Third Reich no film could be produced or distributed in Germany without the approval of the Propaganda Minister. Among the films shown were pictures showing the rise of Naziism in Germany, the entry of the German forces into Austria in March, 1938, and the entry of the German armed forces into Czechoslovakia. These pictures had frequent scenes purporting to show the enthusiasm with which the German people hailed Hitler, and great demonstrations by the people in support of Hitler. There was testimony that during 1937, at the Continental Theatre operated by Ferenz, patrons coming into the lobby customarily gave Ferenz the Hitler salute and Ferenz would return the salute in like manner. On the wall of the lobby in the Continental Theatre was a bronze plaque of Hitler, and there was testimony to the effect that when the picture of Hitler was thrown on the screen some members of the audience arose and extended their arms in the Hitler salute and said, ''Heil Hitler'' and ''Sieg Heil.'' ''Sieg Heil,'' which means ''Hail Victory,'' was heard throughout the audience which applauded vigorously.

Without going into further detail as to the activities of Ferenz, it is apparent from the record that Ferenz was a member of the Friends of New Germany and later of the German-American Bund; that he was in sympathy with the aims and ideals of the Nazi party in Germany, and that he was seeking, by means of speeches, letters, sales of literature and the exhibiting of German-produced films, to create in the United States a public sentiment favorable to Germany and against the entry of the United States into any war against Germany.

It appears also from the evidence that the appellants James McBride, Joan McBride, Daniel Van Meter and Baron Van Meter frequently attended the closed meetings of the German-American Bund, and that James McBride joined the Bund

as a sympathizer and paid the same dues as a member. The treasurer of the Bund did not recall whether appellant Joan McBride was a member, but he did recall that she paid dues. James McBride wore a Storm Trooper's uniform upon several occasions.

On February 22, 1939, in celebration of Washington's Birthday the German-American Bund conducted a meeting in Los Angeles called for propaganda purposes. Among those in attendance were the appellants Daniel and Baron Van Meter, James and Joan McBride, Hermann Schwinn, and Hans Diebel, the owner of the Aryan Book Store at the German House. The Storm Troopers were present at this meeting. In the back of the hall was a table containing much subversive literature. Daniel and Baron Van Meter were distributing anti-Semitic circulars entitled "Onward Jewish Soldiers," which circulars were passed out by them on other occasions, also.

At a closed meeting of the Bund in October, 1940, at which James and Joan McBride, Daniel and Baron Van Meter were present, an order was read from the German-American Bund headquarters at New York, over the signature of Wilhelm Kunze, the national leader, advising the members that the draft law was unconstitutional, and admonishing them to voice their protest.

The record also shows another closed meeting of the German-American Bund in May, 1941, at which the same appellants were present and at which Kunze, the national leader, spoke. On October 18, 1941, a meeting was held at the German-American Bund headquarters in Los Angeles at which Wilhelm Kunze, the national leader, Hermann Schwinn, the western leader, and Hein, San Francisco Bund leader, were present; and, at the same meeting, appellants Daniel and Baron Van Meter, James and Joan McBride, and appellant Robert Noble were also present. At this meeting Kunze made a speech in which he stated that the Tenney Committee was instigated by the Jews, that the members of the Bund should give all possible support to the America First Committee, without, however, neglecting their membership in the Bund; that the German-American Bund was being attacked all over and from everywhere and that they should try to do something to counteract these attacks.

It appears from the record that if appellants Daniel and

Baron Van Meter were not actually members of the German-American Bund they were at least cooperating in its activities. A witness testified that in May of 1941 she observed Daniel and Baron Van Meter having their pictures taken in dark coats, Sam Browne belts and German helmets, with swastikas on their coat sleeves and on their chests. Baron and Daniel Van Meter frequently wore a ring with the emblem of a swastika. They also wore an "I am a copperhead" pin on the lapels of their coats. They continually greeted witness with the "Heil Hitler" salute. The witness had a conversation with Daniel Van Meter in September, 1940, in which he told her that she should write to the Congressman to try to kill the draft law, and also expressed the opinion that the United States had no business in the Hawaiian Islands as the Japanese had developed the Hawaiian Islands and they belonged to the Japanese anyway.

A gardener who was employed at the library across the street from the Van Meter home testified that in 1939 they invited him to attend Bund meetings at least a half dozen times, and that on one occasion he noticed that Baron Van Meter wore a swastika. This same witness also testified that on one occasion Baron and Daniel Van Meter gave him cartoons for distribution entitled "Onward Jewish Soldiers," and that they gave him other anti-Semetic literature and literature relating to the Bund, and said that they were interested in the German cause and that they would like to have him disseminate the literature for them. The witness testified that because of these activities on the part of the Van Meters he finally refused to give them any more grass cuttings, whereupon Baron Van Meter stated that when Germany took over things would be changed and they would be able to get grass from the library. The witness testified further that whenever he met the Van Meters they would extend their arms in Hitler salute fashion, click their heels and say, "Heil Hitler."

The witness Young testified that shortly after May, 1941, he asked the appellant James McBride if he had contributed his share of the assessment for the defense fund in New York on behalf of Fritz Kuhn, which had been requested of the members at a Bund meeting. In reply thereto McBride exhibited his button which bore the emblem of a swastika with a beam of light, the same emblem appearing on the German-

American Bund's membership cards. The button was only given to those who had paid the full amount of their contribution toward the defense fund. In September, 1941, appellant James McBride distributed little stickers upon which was the Jewish star, and underneath the star were the words "Ve Vant Var," and the witness testified that stickers bearing the same emblem and words were on one occasion on the desk of Hermann Schwinn at the Deutsches Haus. Similar stickers and a cut for the printing of the same were found in the home of appellants Robert Noble and Ellis Jones in April, 1942.

It appears from the record that the appellant Ellis O. Jones was the founder of the "National Copperheads." The purposes of this organization are shown by its publication.[1]

The so-called Friends of Progress began to hold meetings presided over by appellant Noble during the latter part of August, 1941. All of the appellants attended a majority of its meetings and participated in at least some of its activities. Prior to December 11, 1941, its meetings were held in the Embassy Auditorium, but the meeting on that date and all

---

[1] "NATIONAL COPPERHEADS.

"The National Copperheads have chosen as a slogan what was intended as an insulting opprobrious epithet hurled at Colonel Lindbergh and his patriotic sympathizers by a peevish power-mad Roosevelt—a fighting slogan around which to rally and organize in support of the unpolluted Americanism, the straight-forward realism and those sound, enduring principles so ably and staunchly enunciated over and over by that most popular of all Americans, our beloved Lindy.

"Events since launching this rapidly expanding organization prove more and more the need of a solid front to combat the sneer-smear campaign of subversive groups against Lindbergh and his followers and nothing has proved this more emphatically than the reaction of certain politicians, editors and other hypocrites to Lindbergh's epoch-marking Des Moines speech, in which at long last, after months of patient restraint, he fixed the blame for the war-mongering precisely where it belongs.

"We need new leadership in the United States, leaders who will think clearly and courageously. Charles A. Lindbergh has proved himself outstanding as such a leader. Thus, unlike practically all other anti-war organizations, the National Copperheads is by no means a passing fancy, but is designed to carry on to further practical accomplishment after the war menace is removed and we are able once more to concentrate upon our own problems. We are for America first, not as an abstract proposition, but concretely by building an organization of true and intelligent patriots in order to eliminate from power those democracy-wreckers who now sit so arrogantly in the seats of the mighty.

"For this purpose we need the active cooperation of similar-minded patriots everywhere. Won't you get in touch with us and tell us"—there a filing stamp or other stamp has made it difficult to see something here —"and tell us you will help. Get our literature. Show your colors by wearing 'I'm a Cooperhead' pins. Distribute the above speech. Give us suggestions.—ELLIS O. JONES, *Founder.*"

subsequent meetings were held in the Convention Hall of the Embassy Auditorium which is located between Eighth and Ninth Streets on Grand Avenue in the city of Los Angeles.

At a meeting held on November 8, 1941, appellant Ellis O. Jones was in the back of the hall selling the paper "Publicity" and there were also some persons selling "Lindy" buttons. There were approximately 270 persons present. The principal speaker of the evening was one James Dorsey Murray. Just prior to Murray's assuming the platform, a few persons in the audience greeted him with a salute described as the right hand extended from the shoulder and palm down in an elevated position. Murray returned the salute and said to the audience, "You were probably surprised to observe me greeting a few of my friends in the audience with this signal. . . . Now, this is not the so-called Nazi salute, but, rather, it is a form of greeting which was devised by the old Romans." But he again extended the salute and most of the persons in the audience responded. Murray then launched into a denunciation of the British government, Winston Churchill, the Jews, the international bankers and the President of the United States. He praised Benito Mussolini as a poor and hard-working boy who had become the great leader of Italy, and he also praised Adolf Hitler as a poor Austrian boy who had finally emerged as the great leader of Germany. Appellant Robert Noble was present on the platform and appellant Ellis Jones was in the foyer selling "Publicity." Daniel Van Meter and Baron Van Meter were either at this meeting or at a meeting of November 15, 1941.

Robert Noble then followed Murray and stated that Murray had given a magnificent speech and that he agreed with and endorsed all of Murray's statements. Noble then announced that an impeachment proceeding would be held and that Ellis O. Jones would act as chief justice and that Noble was going to be the prosecutor of the President of the United States. Noble stated that there would be four meetings held to conduct the impeachment of the President. He then announced that the Friends of Progress had obtained headquarters at 4328 Anaheim-Telegraph Road on the east side of the city, and gave the telephone number.

The next meeting was on November 15, 1941, and there were about four hundred persons present, including appel-

lants Noble, Ferenz and Jones. Noble opened the meeting by introducing one Frank King, who as he started speaking turned his lapel and showed a silver swastika, stating that it was a swastika to show his opposition to those who wore the "V." He stated that the reason for the war was the grasping of the international bankers; that they were the real aggressors in the war, and that the aims of the Friends of Progress were to place before the audience the true facts relative to the conditions of today. King was followed by Noble, who spoke and stated that he had a copy of the book "Mein Kampf"; that he had read it many times and thought it was one of the great books of today. He then read a few passages from "Mein Kampf" and elaborated on those passages by relating the fine housing conditions in Germany and the excellent economic conditions that had been brought about by Hitler. At this point appellant Ferenz passed a note to Noble while he was speaking, and Noble, after reading the note, stated that Mr. Ferenz had sent him a note which had some good information in it which he would pass on to the audience. The note read as follows:

"In Germany when two young persons desire to be married, they file their intentions with the government and fill in some form and they are granted a loan of five hundred dollars. This gives them an opportunity to get started, to buy their furniture and the other necessities that are necessary at the beginning of marital life. And in contrast to the system in America here two young persons getting married proceed to some furniture store and buy a few hundred dollars worth of furniture, paying a dollar down and a dollar a week, and they immediately start out in debt; spend most of their life trying to get out."

Noble then went on to state that there was no unemployment in Germany and that everyone had a job and everyone received a reasonable wage so that he could really live. He then announced that on the following week the impeachment proceedings would start in the main auditorium.

On November 22, 1941, the Friends of Progress conducted an impeachment proceeding at the Embassy Auditorium in the large auditorium upstairs. There was a crowd of about 1,800 persons. Scattered throughout the audience were signs reading "Senate" and "House of Representatives." Appellant Jones opened the meeting and his opening remarks were to this effect: "Search the pages of American history and you

will not find a blacker criminal than Franklin Delano Roosevelt''; that Franklin Roosevelt was a disgrace and should be kicked out of office, and that English and Americans were in league together to run both countries through perdition. Jones turned the meeting over to one Frank King who announced the playing of the Star Spangled Banner and requested the audience to stand and salute the flag. After that he announced that a chaplain would read the invocation, whereupon appellant James McBride took the stand and muttered from a slip of paper what was supposed to be a prayer. Then King took charge of the meeting again and set forth the purposes of the impeachment and asked for a resolution from the floor. Appellant Noble was then introduced as a new member from California, came down the aisle and took a place on the platform at the speaker's table. He spoke about forty-five minutes against the British, the Jews, the New Dealers and the Bank of England, and ridiculed America as the home of the free. He referred to President Roosevelt's mention of the four freedoms and said that we didn't have four freedoms or two freedoms or one freedom; that there was no freedom at all left in America; that the last stronghold of real freedom in the world was Germany. He denounced England, praised Germany and Hitler, and then proceeded to speak upon the subject of Franklin Roosevelt's broken promises in his election speeches. A vote was then taken on the impeachment question, and out of the large audience only three voted against the impeachment. Then little envelopes with a place for the name and address were passed around through the audience. Several of the Van Meter brothers—among them the appellant Daniel Van Meter—and appellants Leone Menier and Ellis O. Jones were all active in passing the boxes to the monitors to be passed through the audience for donations and to place their names and addresses on the envelopes for mailing purposes. The collection boxes appeared to be shoe boxes taped up with gummed paper, with a slot cut in the end. These boxes were up on the stage behind one of the drapes and Daniel Van Meter went to the stage and brought them down to the front where they were handed out to monitors who passed them through the audience. Later, Daniel Van Meter helped collect them, walked up to the front of the room and set them on the stage.

A printer by the name of Rathbone, whose address was

given as 4328 Telegraph Road, was given recognition by Noble and announced that there would be a pot-luck luncheon held the following Wednesday on Telegraph Road, and urged the audience to attend and bring with them old clothes, magazines, bottles, etc., so that they could be used for peace. Announcement was also made that the impeachment meetings would continue and would be held at the following meeting at the same time and place. During this meeting some person took the platform and attempted to defend President Roosevelt, but was not allowed to speak, as the audience was impatient and started saying, ''We don't want to hear that.''

On November 26, 1941, in the Anaheim-Telegraph Road headquarters of the Friends of Progress, there were about forty persons present. Among them were appellants Noble, Jones, Ferenz, and Daniel and Baron Van Meter. This place was a combination of four old railroad cars placed together to form one unit. One of the rooms was set up as a printing room with a place for a press, and Noble stated that they were unable to bring the press over that day but that they would bring it over in the next few days and that as soon as the press got there they would print their notices.

Impeachment proceedings were again held on November 29, 1941, at the Embassy Auditorium. Inside the doorway appellant Jones was seated at a little table selling the newspaper ''Publicity.'' After some musical entertainment Noble came onto the platform and again introduced Frank King who asked that the Star Spangled Banner be played. The audience stood up to salute the flag. King then took the part of Vice President Wallace as President of the Senate, opened the meeting by calling for new business, and stated that resolutions were in order. Then Noble approached the stage with a man and woman who were acting as chairmen of the committee and after conferring with them made the announcement that the President had been impeached by the House. He offered a resolution which called for the chief justice to be brought in. Appellant Jones, acting as chief justice, appeared in a black mortar-board cap and robe and asked that the prisoner be brought forth, whereupon a life-sized effigy of the President was brought onto the stage by Frank King and another man. Noble then launched into a denunciation of the Jews, of Secretary Hull, of the British and of the President, and sought to justify Germany's recent

action in taking Poland and Czechoslovakia. While a collection was being taken Noble urged the audience to come to the Telegraph Road address and bring all of their old junk, newspapers, bottles, etc.

After the meeting of November 29, 1941, adjourned the appellants James McBride and Joan McBride went to the Deutsches Haus. They were first observed on the outside of that building. Later the appellant Jones arrived and then the appellants Van Meter, carrying a couple of shoe boxes similar to the kind in which they had taken up the collection at the meeting of the Friends of Progress. When Jones came up to the front of the Deutsches Haus he was accompanied by several people and when they arrived there they stood at attention and gave the Hitler salute and said "Heil Hitler." Jones asked if the Van Meter boys had come yet, and when the Van Meter boys arrived they all went into the Deutsches Haus. They likewise gave the Hitler salute.

The meeting of the Friends of Progress on December 6, 1941, was attended by a very large audience. Ellis O. Jones, acting the part of the chief justice, began by saying that impeachment proceedings were to be continued and that the same personnel as on the previous week were present. Noble was then introduced and spoke about different personalities, and again denounced the President and declared that the emergency powers granted to the President should be taken away from him at once. He said that the United States was actually dying on its feet. A number of purported witnesses were then called. The first was a man with a placard around his neck to indicate he was a farmer. He gave an account of how the farmers in general had been maltreated by the Roosevelt administration. The next witness was the appellant Genevieve Kerrigan who wore a placard representing the mothers of America. She made many denunciatory and derogatory statements concerning the President and the President's family. The next witness was a young man who was represented as "Blighted Youth." He informed the audience that he saw no future either for himself or for any other young man in this country, that there were about twelve million unemployed and that he, himself, could get no work and had had none since he left college. When "Blighted Youth" concluded these remarks, he walked by the effigy of President Roosevelt which was then on the stage and thumbed his nose at it. Present at this meeting were appel-

lants Jones, Noble, Daniel and Baron Van Meter, Leone Menier, Genevieve Kerrigan and Mrs. McBride. During this meeting Noble referred to Japan as "this glorious nation," and referred to Hitler as "our brother, Adolph Hitler." He also stated: "There is no reason why the Bund shouldn't meet." Noble then directed everyone to go to the Deutsches Haus the following Sunday and attend a meeting or show, saying that there were going to be some pictures there and some entertainment. Either Noble or Jones invited a "Life" photographer who was present at the meeting to attend the Deutsches Haus the following Sunday to view some film which was to be shown, and Noble introduced Miss Menier to the Life photographer as his secretary. After the witnesses had finished their stories Noble talked to the audience while a collection was being taken. He said recently a building had been erected on Pershing Square and his information was that this building had been put up by the Standard Oil Company for the purpose of selling defense bonds; that he personally wouldn't give a thin dime for defense bonds and he couldn't recommend that anyone in the audience buy any either. He went on to say that after the Saturday show it was customary for himself, his friends and his colleagues to go on to the German House. He said there they would see many interesting and instructive things and would learn the truth about Germany and what had been done by the Germans.

On December 8, 1941, the day after the infamous attack on Pearl Harbor, appellants Noble, Menier, Jones, Ferenz, Daniel Van Meter and two other persons met at Clifton's Cafeteria in Los Angeles where a discussion was held as to whether or not the Friends of Progress would hold any more meetings. Noble said that he would have to think it over; that he wanted to finish up the impeachment proceedings as quickly as possible if there was to be a next meeting. He also stated that if the meetings were to continue, that it was his idea for the next meeting to have a Peoples Congress. As those present were leaving the luncheon meeting Noble informed one of them to obtain crepe paper for the purpose of dressing up delegates, and also told them that if they didn't hear from him they would have the meeting.

The next meeting of the Friends of Progress was held on December 11, 1941, in the lower auditorium. It was opened by Noble, and Jones was on the platform. The audience was

much smaller than it had been in the upper auditorium, there being about four hundred persons present. Noble spoke about the attack on Pearl Harbor, saying that the United States had not been attacked by the Japanese, that Hawaii had never been recognized as a part of the United States and that, therefore, the Americans had not been attacked at all. He stated: "Why should not the United States mind its own business and keep out of the Pacific?" He again praised Hitler and said he was doing a much better job in Europe than the Americans were doing here. Noble said he was not in this war; that he had made his stand in 1917 and he kept to that. He then introduced Jones as the next speaker and Jones stated among other things that the United States had no right whatever in Hawaii or in the Philippines, and that Americans should stay in America and mind their own business; that he personally was a pacifist and did not approve of war, but that if it were a question of taking sides, he would much rather be on the side of Germany than on the side of Great Britain. A collection was then taken up and while it was being taken up Noble went on talking and asked the people present to give generously and also to buy the newspaper "Publicity" because that was real defense of the country.

With regard to the impeachment trial, Noble said that this had been sincere and that they would now take a vote on the resolution for the impeachment of the President. The vote was to be taken two ways—by raising hands and afterwards by standing. The vote was taken and the resolution was for the impeachment of the President by a large majority.

Noble then asked the audience to make sure to come out to an address on Telegraph Road where they would be sure to have a good time and get together and get to know each other, and that there was plenty of business to be done in the way of collection for their funds. He stated toward the end of the meeting that there were some people in the audience who were there for the purpose of spying on them, but that these would be dealt with by the Bureau of Investigation of the Friends of Progress, their own organization. He said that he didn't care at all whether some people called what occurred at the meetings treason; that it didn't matter to him; he would continue to say what was in his mind, in spite of anything anybody might do.

The next meeting took place January 7, 1942. There were no flags or decorations and there was no singing or salute to the flag. Noble took the platform and said that the F.B.I. had been unfair to him and that he had been arrested and they had placed his bail at $25,000, which he thought was ridiculous. He related his experience in jail and told about the others who had been arrested with him. They were seated on the platform and he named them—Ferenz, Jones, Leone Menier and Rathbone, and a Mrs. Norman. Noble stated further that in order to show they had no fear of the F.B.I., Leone Menier had made it a point to pass out to each F.B.I. man present all of the literature that they had. Leone Menier was then introduced by Noble who said that she had worked as his secretary for nearly two years without any pay, and that in the beginning she had paid for the rental of the hall out of her own pocket, at great sacrifice to herself, in order to help the Friends of Progress to become organized. She urged everyone in the meeting to attend the meetings regularly and to give Noble their wholehearted support because, she said, he was working for them all the time. Noble then spoke of the horrible conditions that prevailed in our jails. He also spoke of the marvelous job that the Japs had done in Manchukuo— that they had transformed it from a barren infested country into a well-controlled territory. Ellis O. Jones and Rathbone were then introduced, and each spoke briefly. A collection was taken up and Noble, Ferenz, Menier and Jones passed through the audience making a special appeal for dollar bills.

The next meeting took place on January 14, 1942, at the same time and place, and it was announced that the music and phonograph equipment were furnished by Ferenz. Both German and Italian music was played that evening. Noble opened the meeting and said he was glad that they could still hold their freedom meeting and that he could say anything he wanted, anywhere he wanted. He referred to the F.B.I. as the "Futile Bureau of Intimidation," and stated that the Friends of Progress had organized their own F.B.I. called "Friends Bureau of Investigation." He stated that next week he was going to tell a story that would be so shocking that they would scarcely believe it, and that he was going to tell about the so-called Jap war. He added that it had not been proved that anything Lindbergh had said was untrue and we should have listened to him four years ago and done what he said in regard

to protecting our own shores; that America was not legally at war, as he would show them next week. The collection was then taken up and Ferenz was introduced. Ferenz began by relating his experience when he was arrested, and how he had been mistreated. During the collection Noble announced that he was in great need of $150 and that in order to raise this sum he would hand out booklets which he had written, called "The Miracle of Happiness," to anyone who would give $1.00. Noble, Jones and Ferenz assisted in the distribution and sale of this booklet throughout the audience.

The meeting of January 21, 1942, was opened by Ferenz. He started speaking about Robert Noble and the wonderful work he was carrying on "in bringing freedom to us all." After some preliminary remarks Ferenz demanded of the audience, "Why should we continue protecting the wealthy class? Why should we take all the risks?" and then went on to say that the common people would not go on fighting for the capitalistic gangs and that an end would come to that soon. Noble then took the platform and stated that the United States had stolen the Hawaiian Islands in the most despicable manner. He said that if the people really knew what was being done they would stop paying taxes and make it impossible for the Marine Corps to continue running all over the world sticking their noses in other people's business instead of staying home and guarding our own shores. He then read a statement which he attributed to Daniel Webster, which was to the point that conscription was illegal and had no place under the Constitution of the United States. He also said that there never was a legal declaration of war in this so-called war and that we were not at war. He criticised various public officials, including the Secretary of the Navy and the Secretary of War, and said: "You don't find such men as those at the head of the Army and Navy of Germany and Japan and they are winning battles, and not talking about what is going to happen in 1993." After some more remarks along the same line Noble announced that he would be available and would be out at the Anaheim-Telegraph Road house on Saturday afternoon and evening and invited anyone to come out and talk things over with him. He also announced that Ferenz would speak on the following Sunday, giving virtually the same speech that he had made at the Friends of Progress meeting. He stated that for what he said and did on December 11th he

fully expected to go to prison and remain there for the duration of the war or longer, but he was willing to make that sacrifice if that was necessary to be free.

The meeting of January 28, 1942, was opened by appellant Jones. He spoke for about ten minutes, principally in denunciation of England, her Prime Minister and her policies. Noble then spoke and stated how very valuable Mr. Jones' help was to the Friends of Progress, and how he appreciated and was grateful for the contact. He then proposed that Jones be elected an associate director of the Friends of Progress association and asked for a show of hands by all of those in favor. There was a unanimous showing of hands. Noble then read from an editorial in the Los Angeles Examiner dealing chiefly with the mistakes that England had made during the war, and then indulged in a further harangue about the United States never having legally acquired the Hawaiian Islands, and in denunciation of the President and our national government generally. Noble further stated that the time was fast approaching when the impeachment trial would be resumed. He then made a strong appeal for contributions, and Ferenz and several others took up a collection. Appellant Genevieve Kerrigan was introduced by Noble as one who had been of real service, a dear friend. She spoke briefly about the work that was being done by the Friends of Progress cooperative store on Telegraph Road, and made an appeal to all those present to bring their cast-off things, clothes, tinfoil, newspapers, magazines, etc.

The next meeting took place on February 4, 1942, in the Convention Hall of the Embassy. Noble made a statement regarding a young lady commonly referred to as Miss Lee, and said that she was Leone Menier; that he had asked her to be present that evening and sit on the platform and take notes, acting as secretary for the Friends of Progress. Noble then referred to a newspaper article which stated that 44 per cent of the people were not converting their savings stamps into bonds but were cashing them in for money, and cited this as proof of the fact that the people of the country were not united. Jones was then introduced by Noble. He read a letter which he said he had received from a United States Senator, which letter commended Noble and Jones for the fine work they were doing and criticised the manner in which national affairs were being conducted in Washington. However,

he did not mention the name of the senator but said that the man was an old school chum. During the time the collection was being taken up the entry way was filled with men, and one of them walked to the platform and handed Noble and Jones a summons. Noble announced that the man in charge was Jack Tenney, chairman of the Legislative committee investigating subversive activities. There was considerable confusion and a number of people stood up and tried to get out of the various entrances.' Ferenz was also handed a summons. Leone Menier came out onto the sidewalk with a notebook in her hand and said to some of the persons who had left: "What's the matter, are you afraid? This is America. Come on back in. Come on in, the meeting is still on." Noble continued speaking on the platform, but Jones went across the street with Jack Tenney and the committee members to a hotel and took the collection boxes with him. Ferenz, who was in the audience, asked to speak and came upon the stage, waved the summons with which he had been served, and criticised what he called the Gestapo-like actions of the committee. Noble again took the platform and said that because of the action of the Tenney Committee he would not make the astonishing statement that he had come prepared to make. He then indulged in an attack upon General MacArthur and the American financiers who he said were backing the war. He closed by saying: "You know, I have been accused of being an Axis sympathizer." He hesitated a moment and then said: "Well, I am and I'll tell you why. Because they are the great liberators in this world today."

The meeting of February 18, 1942, was opened by Noble who complimented those present on their courage in coming out to the meeting. He said that neither Jack Tenney nor the Tenney Committee nor anyone else could stop him from saying what he pleased and when he pleased on any subject that he pleased to talk about; that the meetings would continue and he would continue his fight for freedom for everybody; that he had always been opposed to the draft and conscription in any form, and that in his opinion the draft was illegal and had no place under the Constitution. He criticised President Roosevelt, Mrs. Roosevelt, Mayor La Guardia of New York, Prime Minister Churchill, the British Empire and the war effort generally, then introduced Jones who talked much along the same line.

The next meeting of the Friends of Progress was on February 25, 1942. There was an admission charge of ten cents. They were collecting newspapers that night, and bundles of clothing and other things were brought in. Mrs. Kerrigan assisted with the bundles. Present at this meeting were appellants Noble, Ferenz, Leone Menier, Joan McBride, Genevieve Kerrigan and Daniel Van Meter, and Mrs. Norman and Mr. Rathbone. Ferenz furnished phonographic music. Noble opened the meeting by telling about the glorious experience he had had testifying before the Tenney Committee. He then stated that Jones was not present because about two hours before the meeting convened he had been arrested and taken to jail and his bail fixed at $50. He asked that everyone who could, give a dollar bill, until they had collected $50, so that Leone Menier and some man who was to drive her would go to the jail and bail Mr. Jones out and bring him to the meeting. Noble then continued with quotations from speeches by Adolf Hitler and Dr. Fricke, told about incidents in the Philippines, and criticised war-mongers and our national administration in general. He referred to Lindbergh and said that a majority of the people were isolationists and that we shouldn't forget Lindbergh and Nye and Wheeler. During the taking of the collection Noble started talking about a speech that President Roosevelt had just made and said that the President's speech was timed in order to help Churchill finish his job in England. He announced his topic for the following week's meeting as ''The truth about the Jews in Germany today,'' and said there would be a charge of twenty-five cents. He urged everyone to go to the Anaheim-Telegraph Road on Saturday, as that was an open house day, and asked them to bring papers, junk and old clothes, and come and share in coffee and cookies and general discussion. He announced that some extra copies of the Friends of Progress Weekly Bulletins were on sale at the entrance and Mrs. Kerrigan was there selling them.

At the meeting of March 4, 1942, Noble spoke at length about the Jewish problem in Germany and sought to justify the actions of Hitler and the Nazi party in their anti-Jewish measures. He then discussed the National Socialist program in Germany and the things which he claimed that program was accomplishing for the young people, the workers and the people generally.

The meeting of the Friends of Progress on March 18, 1942,

was opened by Noble, and after some remarks he introduced Jones who delivered his usual harangue in criticism of the policy of the United States in the Hawaiian Islands and the Philippines, and in criticism of the British Empire and its policies. During the course of his remarks Jones asked: "Why do we have to send our good boys around the world for the Standard Oil Company and other interests?" After Jones concluded, Noble again made a rather long speech criticising the President, the Jews, General MacArthur, Secretary Hull and our national administration and war effort generally. He also asserted that Chiang Kai-Shek was a traitor to his own people of the Orient. He then made a plea to the audience to help raise funds and said that the contributions were not for Robert Noble or Ellis Jones but for "you."

A meeting of March 25, 1942, was likewise opened by Noble, who introduced Jones to the audience as the cofounder of the Friends of Progress. Both Noble and Jones spoke in criticism of our government and the government of Great Britain, and of the conduct of the war, and again praised the manner in which Hitler did things in Germany. Noble spoke of the fine work done by the Japanese in Korea and Manchukuo, and again ridiculed General MacArthur and his efforts in the Philippines.

On April 1, 1942, an investigator for the American Legion attended the meeting place of the Friends of Progress. This was the day of the arrest of Noble and Jones by the F.B.I. There were many people around the meeting hall, but no meeting or scheduled program was being conducted at the time he arrived. While he was conversing with the manager of the Embassy Auditorium, appellant Ferenz came up to the manager and said he would like to take charge of the meeting; that he had been present when Noble and Jones had been apprehended by the F.B.I. and that he had their authority to take charge of the meeting; that he would like to go down to the meeting place and tell the members of the organization what had happened and explain why Noble and Jones were not there. Ferenz then went in and spoke to the gathering, once from the platform and once from the floor. During the meeting appellant Genevieve Kerrigan also spoke to the audience from the floor.

Written leases on the rooms occupied at the Embassy Auditorium by the Friends of Progress were always taken in the

name of appellant Robert Noble. Eleven of the leases introduced in evidence were signed by appellant Robert Noble personally, five were signed by Leone Menier, one by Jones and one by appellant Genevieve Kerrigan.

An investigator testified that on December 11, 1941, he overheard a conversation among the appellants Menier, Noble and Jones prior to the regular meeting in the Convention Hall, in which said appellants mentioned that they had gotten together previously upstairs with a number of others discussing ways and means of conducting future meetings. The conclusion was reached that they should carry on. The same witness testified that after a meeting of the Friends of Progress of January 17, 1942, he went with Noble and Jones to a restaurant where they met Ferenz and Miss Menier, and overheard a general conversation about the meeting in the course of which Ferenz told Jones that he had heard about the Schwinns being picked up. The same witness testified that in the latter part of January he took Ferenz home after a meeting and that when they got close to Ferenz' house Ferenz asked the witness to drive around to be sure there weren't any officers looking for him; that Ferenz also stated that the Van Meter boys were mad at him because he had told them to quit wearing the buttons. Several meetings later this same witness assisted Ferenz in taking back the records and a victrola which had been furnished at the meetings of the Friends of Progress. Ferenz also told the witness of his life in Germany and stated that he felt he was better grounded in the Nazi party than Hitler. The witness also testified that at one of the meetings of the Friends of Progress subsequent to December 7, 1941, Noble announced from the platform that appellants Menier and Kerrigan would be selling the "Ve Vant Var" stickers after the meeting and that everyone should buy a package; and that said appellants sold these stickers after the meeting at ten cents a package.

The prosecution introduced in evidence fifteen copies of a mimeographed bulletin headed "Friends of Progress." These bulletins may be generally described as announcements of future meetings of the Friends of Progress and summaries of what had transpired at previous meetings. The first of the bulletins introduced was dated December 3, 1941, and bore the title "Friends of Progress. Box 51-Hollywood. Robert Noble, Director." Commencing with the bulletin of Febru-

ary 9, 1942, the title read: "Friends of Progress. Box 51-Hollywood. Director Robert Noble. Associate Ellis O. Jones." These bulletins usually consisted of two legal-sized mimeographed pages and contained generally statements similar to those made at the various meetings, which statements it is not necessary to detail further.

The testimony of Robert Noble given at the hearing of the Tenney Committee was introduced in evidence. In this testimony Noble stated that he was giving lectures at the meetings of the Friends of Progress held at the Embassy, directed exclusively toward the end of trying to keep this country out of war, and that he organized the group known as the Friends of Progress. He was asked if he had made the following statement at a meeting of the previous night:

"I say that I am for Germany and for Hitler. [Held up his hand in the Hitler salute and said 'Heil Hitler.'] I do not know why people should be so shocked when we say we are for Germany and for Hitler. You know as I told you Germany has won this war and we might as well recognize the New Order and the United States of Europe."

Noble answered: "I substantially made that statement, I don't know if I said 'Heil Hitler,' but I am perfectly willing to." He then proceeded in his testimony before the Tenney Committee to praise Hitler and Mein Kampf and to criticise the Jewish people.

Ben S. Beery, an attorney of Los Angeles, who was chairman of the Americanism Committee of the American Legion, testified that on October 20, 1941, appellants Daniel Van Meter and James McBride came to his office and requested copies of the American Legion report which had previously been offered in evidence before the Legislative Committee. James McBride stated that the report had charged him with being a Storm Trooper and a member of the Bund, and asserted that it was not true. Daniel Van Meter also stated that it was not true and asked for the source of the information. James McBride then brought into Mr. Beery's office Mrs. Joan McBride and a person whom he introduced as Baron Van Meter but who Mr. Beery later learned was William Van Meter. James McBride stated that he and the person whom he called Baron Van Meter were in favor of Hitler and wanted Hitler to win the war, and stated that the publicity which he had received by reason of the said Legion

report would enable him to enter Germany at any time. All four stated that they were in favor of the Nazis, and James McBride stated that he thought Hitler was a very fine man. As James McBride went to the door of the office, he turned, faced Mr. Beery, stood at attention, raised his right hand and gave the Nazi salute and said, ''Heil Hitler.'' Mr. Beery testified that he had previously seen Baron Van Meter and James McBride picketing the Willkie meeting held at the Hollywood Bowl in July, 1941, and that he also had seen Joan McBride there.

On or about April 1, 1942, investigators from the district attorney's office of Los Angeles County went to a residence on Farmdale Avenue in the city of Los Angeles occupied by appellants Noble and Jones who at that time had been arrested by the F. B. I. Among the material and documents found at this residence were a cartoon entitled ''Onward Jewish Soldiers,'' which is identical with the cartoon distributed by the appellants Van Meter; ''Ve Vant Var'' stickers and a block for the printing of the same; and two or three hundred pamplets printed by one D. H. Rathbone which were violently critical of the President of the United States and of the Congress and in which were stated some of the purposes of the Friends of Progress, and which stated that ''Germany's policy is to rule for the cause of right by telling you what is the right—the just—the wise thing to do—if, because of prejudice or hate of them, you do the opposite, you just ruin yourself, by your foolishness.'' There was also found a copy of a letter written by appellant Robert Noble to the German Library of Information in New York, criticising the course of our national government and thanking the Library of Information for data and literature which had been sent by it.

Subsequent to their visit at the Noble and Jones residence, the officers from the district attorney's office went to 4328 Anaheim-Telegraph Road where they found D. H. Rathbone operating a printing press and printing pamphlets of which five or ten thousand had already been printed, which read as follows:

''The Meanest Joke the Germans Ever Played on the U. S. A.? This drop of ink should make a billion people think. Was when they saved F. D. Roosevelt from dying with infantile paralysis enabling him to double cross the American people into slavery to the British and Jewish criminals.

"The one positive proof of insanity is when the diseased mind turns against its friends and clings to its enemies.

"If it was right—and kindness to the American People, for the Germans to save Roosevelt, then are we not acting in an insane manner to be making war on Germany now?

"It is a beastly betrayal of confidence—an act of no less than treason against the whole world—for the government of the U. S. A. to let the British bunko the rest of the world into thinking that they, the British, are fighting for the same principles of Liberty and Justice that we, the American people, are fighting for. When they are in fact fighting the opposite! . . ."

Rathbone informed the officers that he was printing this pamphlet for Mr. Noble and Mr. Jones.

The foregoing recital does not contain all of the testimony adduced at the trial, but does include the main evidence relied upon by respondent to support the verdict of the jury.

We shall now discuss the contentions of appellants as to the sufficiency of the evidence to support the judgments of conviction. The first of these contentions is that the evidence fails to show that there was in fact a governing body of the Friends of Progress or that appellants were members of it. It was of course necessary for the People to prove beyond a reasonable doubt not only that there was such a governing body, but also that appellants were members of it.

The trial court instructed the jury that "A governing body of an organization or group means the body or group which in fact controls the action or conduct of the main organization or group, either by established rules, by arbitrary will or in any other manner; in other words, the governing body is composed of the persons in an organization or group who direct, control, rule or regulate the main organization or group, either by actual or assumed authority."

Assuming but not deciding that the so-called Friends of Progress constituted such a group, body or organization as is within the contemplation of the California statute, and that it was not within the exemption mentioned therein, it is quite clear from the record that appellant Noble was the person who directed its activities. He presided at its meetings, made announcements as to future meetings and other activities, introduced the various speakers who spoke at the meetings, and appeared to have general control over it. It

does not appear that any other person or persons had any power to interfere with Noble's control over the Friends of Progress or to overrule any decision he might make as to its activities. So far as control is concerned, it must be stated that the friends of Progress was as nearly a one-man organization as would be possible to imagine. As shown in the statement of facts hereinbefore set forth, all of the appellants participated in the meetings and activities of the Friends of Progress to a greater or less extent, but with the exception of appellants Noble and Jones there is nothing in the record to support any inference or conclusion that any of such other appellants were members of any governing body. In fact, it is extremely doubtful if there is any evidence in the record to justify a conclusion that there was in fact a governing body; but there is some basis for inferring that Noble and Jones were directing the Friends of Progress. The bulletins of Friends of Progress, which were introduced in evidence, at first were headed "ROBERT NOBLE—Director." Later, after Noble had announced in open meeting that Jones had become associate director, the bulletins were headed

"DIRECTOR         ASSOCIATE
ROBERT NOBLE.      ELLIS O. JONES."

So having in mind the familiar rule that the jury is the judge of the facts and that if there is any evidence from which it could reasonably be inferred that appellants Noble and Jones were members of the governing body of the Friends of Progress, we must sustain the implied finding of the jury upon that issue, we conclude that there is sufficient evidence in the record that appellants Noble and Jones were members of the governing body.

However, as to the appellants F. K. Ferenz, Leone Menier, James M. McBride, Joan McBride, Daniel Van Meter, Baron Van Meter and Genevieve Kerrigan, we are unable to find any support in the evidence for any conclusion that any of said appellants were members of a governing body.

 It must be borne in mind that we are here concerned with a statute which is penal in its nature and that such a statute must be construed in a strict and accurate sense. As was said by our Supreme Court in *In re Twing*, 188 Cal. 261, at page 265 [204 P. 1082]: "Penal statutes must be construed to reach no further than their words; no person can be made subject to them by implication." (Citing *People*

v. *Tisdale*, 57 Cal. 104, 107; *Ex parte Kohler*, 74 Cal. 38 [15 P. 436]; *H. Hackfeld & Co.* v. *United States*, 197 U.S. 442 [25 S.Ct. 456, 49 L.Ed. 826].) As was said by Chief Justice Marshall in the case of *United States* v. *Wiltberger*, 5 Wheat. (U.S.) 76, 95 [5 L.Ed. 37, 42], quoted in *H. Hackfeld & Co.* v. *United States, supra:*

"The rule that penal laws are to be construed strictly is, perhaps, not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals, and on the plain principle that the power of punishment is vested in the legislative, not in the judicial, department. It is the legislature, not the court, which is to define a crime and ordain its punishment."

▆▆▆ The very most that the record shows as to these appellants is that they did participate in various ways in the meetings and activities of the Friends of Progress. But these activities, as shown by the record and as hereinbefore set forth, fall far short of showing that they were members of any governing body, or that they or any of them, in fact, controlled the action or conduct of the Friends of Progress. As hereinbefore stated, all of the appellants were charged in the indictment "as members of the governing body" of the Friends of Progress. It was therefore necessary for the People to prove that they were members of such governing body. As we have pointed out, proof is lacking that any of the appellants, with the exception of Noble and Jones, were members of such a governing body. Without such proof the convictions of the appellants Ferenz, Menier, James M. McBride, Joan McBride, Daniel Van Meter, Baron Van Meter and Genevieve Kerrigan cannot be sustained.

In addition to proving that appellants, or some of them, were members of the governing body of the Friends of Progress, it was necessary, as the jury was properly instructed by the trial court, for the People to prove one of the following three allegations concerning the Friends of Progress:

"(1) That it directly or indirectly advocated, advised, taught, or practiced the duty, necessity or propriety of controlling, conducting, seizing or overthrowing the government of the United States or of this State or of any political subdivision thereof, by force or violence; or

"(2) That it was subject to foreign control in that it solicited or accepted financial contributions, loans or support

of any kind, directly or indirectly, from, or was affiliated directly or indirectly with a foreign government or political subdivision thereof, or an agent, agency or instrumentality of a foreign government or political subdivision thereof, or a political party in a foreign country, or an international political organization; or

"(3) That it was subject to foreign control in that its policies, or any of them, were determined by or at the suggestion of, or in collaboration with a foreign government or political subdivision thereof, or an agent, agency or instrumentality of a foreign government, or a political subdivision thereof, or a political party in a foreign country, or an international political organization."

Appellants contend that the evidence is insufficient to show that the Friends of Progress, directly or indirectly, advocated, advised, taught, or practiced the duty, necessity or propriety of controlling, conducting, seizing or overthrowing the Government of the United States or of this State or of any political subdivision thereof by force or violence. As shown by the statement of facts hereinbefore set forth, at the meetings of the Friends of Progress statements were made and sentiments expressed which are well calculated to excite the indignation of every right-thinking and patriotic American. Vicious and unreasoning attacks were made upon our own government and its policies and upon one of our military allies. Flagrant appeals to false and sinister racial theories were made, and the leaders of our republic, including our President, were grossly maligned. Appellant Noble and other speakers denounced our form of government and praised Hitler, Mussolini and Japan, and boldly asserted that in those countries there was a greater degree of liberty than existed in the United States of America. Indeed, the utterances of appellants Noble and Jones became such that even before the trial of the instant case they were indicted by the Grand Jury of the United States District Court for the Southern District of California, and convicted of the crime of conspiracy to violate section 33 of title 50 of the U. S. Code, 50 U.S.C.A., sec. 33, regarding seditious or disloyal acts or words in time of war. During the so-called impeachment trial of the President of the United States there was a life-sized effigy of the President on the platform, and during said trial the statements made regarding the President, and the conduct of some of the appellants and others toward the

President, were disgraceful. We can have nothing but the greatest contempt for the statements, actions and conduct of appellants shown by the record, but this does not relieve us from the necessity of determining the question of whether or not there is in the record evidence sufficient to prove that the Friends of Progress was an organization which advocated the overthrow of the Government of the United States by *force or violence*. Counsel for respondent, in their brief and upon the oral argument, realizing, no doubt, that there is nowhere in the record any statement by any of the appellants advocating the overthrow of the Government of the United States by force or violence, take the position that appellants were advocating what they call "psychological warfare." Upon the oral argument counsel for respondent stated:

"In connection with that we take the position that by advocating the psychological warfare which we have discussed in the brief and by carrying on the program of the Nazi government here in the United States and giving aid and comfort to the Nazis and the Japanese they were attacking our country by force and violence and in so doing they were advocating the overthrow of our Government by force and violence. I think it is established that it was the intent of the Nazi government to overthrow this Government and set up a world state. Mr. Noble says it will only be a matter of time until there will be a new order of things. By reading the evidence and inferences, I think you can see they were advocating the complete destruction of the form of government as we know it here in the United States, and while we do not contend they were throwing bombs or gathering arms to make an assault, we contend by psychological warfare, following the Nazi program of divide and conquer, they were just as much participating in an attempt to overthrow the government by force and violence."

While we recognize that any activity which creates a lack of confidence in our form of government and promotes disunity and dissension among our people is in a sense giving aid and comfort to our military enemies, yet, having in mind that we are here considering a penal statute which must be construed narrowly and whose words must be taken in a strict and accurate sense, we cannot hold that a statute which requires proof of the advocacy of the overthrow of the Government of

the United States by force and violence is satisfied by mere proof that appellants indulged in intemperate, unreasoning, sinister and iniquitous criticism of our form of government, our officials and our allies, or praised a different form of government. Our government has other statutes dealing with the regulation of utterances and acts of citizens in time of war, and we do not believe that a statute such as the one under consideration here, the purpose of which is merely to require registration in the office of the Secretary of State of organizations which advocate the overthrow of the Government of the United States by force and violence, means anything other than what the words of the statute aver, namely, "force or violence."

We come, therefore, to the conclusion that the contention of appellants that the evidence is insufficient to show that the Friends of Progress advocated or advised the overthrow of the government by force and violence must be sustained.

We next consider the question as to whether there is any evidence to support a finding that the Friends of Progress "was subject to foreign control in that it solicited or accepted financial contributions, loans or support of any kind, directly or indirectly, from, or was affiliated directly or indirectly with a foreign government or political subdivision thereof, or an agent, agency or instrumentality of a foreign government or political subdivision thereof, or a political party in a foreign country, or an international political organization." This question is to a certain extent interwoven with the further question as to whether or not the evidence was sufficient to support a finding that the Friends of Progress was "subject to foreign control in that its policies, or any of them, were determined by or at the suggestion of or in collaboration with a foreign government or political subdivision thereof, or an agent, agency or instrumentality of a foreign government, or a political subdivision thereof, or a political party in a foreign country, or an international political organization." We shall, therefore, consider and discuss these two questions together.

Appellants contend that there is no evidence in the record to prove any of these requirements of the act; that there is no evidence to show that the Friends of Progress was subject to foreign control or that its policies or any of them were determined by or in collaboration with a foreign govenment or

an agent, agency or instrumentality of a foreign government or foreign political party. It was the theory of the respondent that the Friends of Progress was connected with the German government and the Nazi party through appellant Ferenz, whose activities we have hereinbefore set forth in some detail. Counsel for respondent, upon the oral argument before this court, stated:

"It is our position that Mr. Ferenz was the agent of a foreign country and that is one reason why the background evidence was put in. It shows that Mr. Ferenz at the very inception of the Nazi program in Germany was in close touch with the German government and connected with every single one of the German organizations."

And in respondent's brief it is stated, on page 292:

"We think that there was ample evidence to justify a finding by the jury that appellant Ferenz was an agent of Nazi Germany. His connection with the German-American Vocational League, the German-American Bund, the V.D.A. (Society for the Germans in Foreign Countries) organization, the UFA Film organization, the Winterhelp Abroad program and the German Library of Information shows a connection with every agency of Nazi Germany operating in this country and clearly indicates that he was no loyal American citizen with only a passing interest in his homeland. His every activity was directed toward the promotion of Hitler and Nazi Germany. He was a propaganda agent of Nazi Germany, and we think this was clearly shown by the evidence. When the Friends of Progress accepted suggestions from him, many of which were shown by inference, and one of which we have shown openly existed, its policies were being determined by, at the suggestion of, and in collaboration with, a foreign government, a political subdivision thereof and a political party and an agent of such foreign government."

As we have hereinbefore stated, it is apparent from the record that appellant Ferenz was a member of the Friends of New Germany and later of the German-American Bund; that he was in sympathy with the aims and ideals of the Nazi party in Germany and that he was seeking by means of speeches, letters, sales of literature and the exhibiting of German produced films, to create in the United States a public sentiment favorable to Germany and against the entry of the

United States into any war against Germany. It also appears from the evidence that he attended a number of meetings of the Friends of Progress and participated to some extent, as shown in the statement of facts hereinbefore set forth, in the activities of that organization. But a careful study of the record fails to disclose any evidence upon which a finding can be based, either by inference or otherwise, that the policies of the Friends of Progress, or any of them, were determined by or at the suggestion of Ferenz. So even if it could be held that Ferenz was the agent of a foreign government or of a foreign political party, a matter upon which we believe the evidence is likewise insufficient, proof is entirely lacking to show that the Friends of Progress was subject to foreign control in that its policies or any of them were determined by or at the suggestion of an agent of a foreign government. Respondent in its brief laid great stress upon the fact that appellant Ferenz "committed one error in his plan which directly connects him with the program of the Friends of Progress." Respondent then quotes the following from the testimony of the witness William J. McCarthy, Jr., as to what occurred at the meeting of the Friends of Progress on November 15, 1941:

"At this point some person passed a note to Mr. Noble who was speaking and he paused a moment and read the note and then stated, 'I have a note here which contains some very good information which I will pass on to you. It was sent up here by Mr. F. K. Ferenz who is standing in the back of the hall.'

"MR. BABCOCK: Q. Did he point to the back of the hall? A. Yes, he pointed to the back of the hall.

"Q. Did you see Mr. Ferenz there? A. And most of the audience turned and observed Mr. Ferenz who was standing at the rear of the hall.

"Q. And you saw Mr. Ferenz there? A. Yes.

"Q. Proceed, please.

"A. He then read or enlarged upon the note which was as follows: 'In Germany when two young persons desire to be married, they file their intentions with the government and fill in some form and they are granted a loan of five hundred dollars. This gives them an opportunity to get started, to buy their furniture and the other necessities that are necessary at the beginning of marital life. And in contrast to the system in

America here two young persons getting married proceed to some furniture store and buy a few hundred dollars worth of furniture, paying a dollar down and a dollar a week, and they immediately start out in debt; spend most of their life trying to get out.' . . .''

The fact that respondent relies so strongly upon this incident illustrates the difficulty that respondent or anyone else encounters in trying to find in the record any substantial evidence to support the contention that the Friends of Progress was subject to foreign control or that its policies were determined by or in collaboration with an agent of a foreign government.

The mere fact that a person passed up a note to a speaker at a meeting or even participated in the meeting itself, or in some of the activities of the particular group holding the meeting, cannot be accepted as sufficient evidence to prove that the policies of the organization or group were determined by such person. Particularly is this so when, as we have already held, the evidence is insufficient to show that appellant Ferenz or any of the appellants other than Noble and Jones were members of the governing body of the Friends of Progress. We are unable to agree with respondent that the evidence is amply sufficient to support the verdict of the jury on the matter of affiliation with a foreign agent, or upon the matter that the policies of the Friends of Progress were determined by or at the suggestion of the agent of a foreign government.

As to whether the Friends of Progress accepted financial contributions or support from a foreign government or agent of a foreign government or a political party, evidence is entirely lacking, and we do not undersand that respondent makes any contention that there was evidence to support such a finding.

We deem the following language of our Supreme Court in the early case of *Ex parte McNulty,* 77 Cal. 164, at page 168 [19 P. 237, 11 Am.St.Rep. 257], to be quite applicable here:

"Constructive crimes—crimes built up by courts with aid of inference, implication and strained interpretation—are repugnant to the spirit and letter of English and American criminal law."

Appellants make numerous other contentions as to errors in instructions given by the court to the jury, errors of the court in the admission of evidence, and error on the part of

the court in denying appellants' motion for a mistrial because of alleged misconduct of one of the counsel for respondent in his closing argument to the jury. A number of these contentions raise some very serious questions, but in view of the fact that the judgments and orders must be reversed for the reasons hereinbefore set forth, we deem it unnecessary to unduly prolong this opinion by discussing them.

As hereinbefore stated, appellants in their briefs, and the attorneys for American Civil Liberties Union, as amici curiae, contend that the California Subversive Organization Registration Act, the act here involved, is unconstitutional because it is in conflict with certain federal legislation on the subject, and that it therefore violates article VI, section 2, of the Constitution of the United States. They contend that the field covered by the act has been wholly occupied by the Registration of Certain Organizations Act, commonly referred to as the Voorhis Act, and the Registration of Foreign Propagandists Law, commonly referred to as the McCormick Act. We are frank to state that we are in grave doubt as to the constitutionality of the California Subversive Organization Registration Act, but in view of the fact that the convictions of all of the appellants must be reversed upon other grounds already enumerated, we deem it unnecessary to pass upon the constitutionality of the statute.

We are not unmindful of the fact that individuals such as the appellants are shown by the record to be, have by their acts and statements justly earned the contempt of patriotic Americans. It is difficult to understand how persons who live under our Constitution and our laws can utter such sentiments as appellants have uttered. This court can only regret that the state of the record is such that we are compelled to reverse the judgments of conviction; but we do not believe that anyone can study the record in this case as we have studied it and arrive at a different conclusion. It must not be forgotten that the offense with which appellants were charged was, briefly, that they were members of the *governing body* of an organization, "Friends of Progress," that advocated, advised, taught and practiced the duty, necessity and propriety of overthrowing the Governments of the United States and the State of California, by *force and violence;* that the organization was subject to foreign control in that it accepted financial support from and was affiliated with a foreign government and an agent thereof; that the policies of said organization, or some

of them, were determined by, at the suggestion of and in collaboration with a foreign government and an agent thereof; and that, as members of the governing body of such organization they wilfully, unlawfully and feloniously failed to file the information and documents as required by the Subversive Organization Registration Act.

As we have hereinbefore pointed out, the evidence is insufficient to sustain the conviction of appellants of the offense charged in the indictment. Under such circumstances our duty is clear and plain. Unpleasant though it may be, and unpopular though it may prove in such a case, if our judicial system is to be true to the highest traditions of our jurisprudence an appellate tribunal should not shirk its responsibility where the record fails, as it does in this case, to support the convictions.

In view of the foregoing, the judgments of conviction as to all appellants and the orders denying the motions of each and all defendants for a new trial should be and they are reversed.

Respondent's petition for a hearing by the Supreme Court was denied May 24, 1945. Shenk, J., Edmonds, J., and Spence, J., voted for a hearing.